## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICKEY HWANG, individually, and on behalf of all others similarly situated., | Case No. 2:24-cv-02033 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| FINANCIAL BUSINESS AND CONSUMER SOLUTIONS, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Mickey Hwang ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class Members"), brings this Class Action Complaint against Defendant Financial Business and Consumer Solutions, Inc. ("FBCS" or "Defendant"), and alleges upon personal knowledge as to himself and upon information and belief as to all other matters.

### INTRODUCTION

1. Plaintiff brings this class action against FBCS for its failure to secure and safeguard his personally identifiable information ("PII"), and the PII of nearly 2.7 million other individuals.

2. Headquartered in Hatboro, Pennsylvania, FBCS is a debt collection agency that receives PII about individuals from its business clients.[1] This information is then used for FBCS' debt collection efforts. By coming into possession of this sensitive data, FBCS assumed a legal duty to take reasonable measures to safeguard it.

---

[1] https://www.fbcs-inc.com/about-fbcs-collection-agency/ (last visited May 12, 2024).

3. On or around April 26, 2024, FBCS notified the Attorneys General of Montana and Maine that it had experienced a data breach (hereinafter, the "Data Breach").[2] At the time, FBCS indicated that the Data Breach had impacted the PII of 1,955,385 people. On May 10, 2024, however, FBCS advised the Maine Attorney General that the number of impacted persons had increased to 2,697,555.[3]

4. According to the information on the Maine Attorney General's website, FBCS stated that it had "discovered unauthorized access to certain systems in its network" on February 26, 2024, and that between February 14-26, an "unauthorized actor had the ability to view or acquire certain information on the FBCS network."[4] FBCS acknowledged that "certain information provided by customer organizations related to individuals may have been accessed or exfiltrated during the incident."[5]

5. According to FBCS, the PII "that could have been subject to unauthorized access" during the Data Breach includes names, Social Security numbers, birthdates, and other account information.[6]

6. FBCS began mailing written notice of the Data Breach on April 26, 2024. On May 9, 2024, Plaintiff Hwang received a letter from the Executive Vice President of FBCS stating that "certain information related to you may have been accessed or exfiltrated during" the Data Breach.

---

[2] *See* https://dojmt.gov/consumer/databreach/ (last visited May 1, 2024); *see also* https://apps.web.maine.gov/online/aeviewer/ME/40/5fe1ede5-aafd-4da2-b1a4-0057a6cdadc6.shtml (last visited May 1, 2024).

[3] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/47ea0bb7-cdf0-4fd4-b2b5-06d285ddf9a0.shtml (last visited May 12, 2024).

[4] *Id.*

[5] *Id.*

[6] *Id.*

7.      Despite first becoming aware of the Data Breach on February 26, 2024, FBCS has only now begun notifying impacted persons. FBCS' letter to Mr. Hwang recognizes that its notification was "delayed," but states that it is *not* "as a result of a result of a law enforcement investigation."

8.      As set forth below, the Data Breach was a direct result of FBCS's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect client's PII from the foreseeable threat of a cyberattack.

9.      The security of Plaintiff's and Class Members' identities is now at risk because of FBCS's wrongful conduct as the PII that FBCS collected and maintained is now in the hands of data thieves. Given the type of data involved – including Social Security numbers – this present risk will continue for the course of their lives.

10.     Plaintiff, on behalf of himself and the putative class he seeks to represent, asserts claims for (i) negligence, (ii) negligence *per se,* (iii) unjust enrichment, (iv) breach of implied contract, (v) violations of Declaratory Judgment Act, (vi) breach of contracts to which Plaintiff and Class Members were intended third-party beneficiaries, and (vii) violations of the New Jersey Consumer Fraud Act. Plaintiff and Class Members thus seek actual damages, statutory damages, restitution, injunctive and declaratory relief (including significant improvements to FBCS's data security protocols and employee training practices), reasonable attorneys' fees, costs, expenses incurred in bringing this action, and all other remedies this Court deems just and proper.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class

is a citizen of a different state than Defendant, there are more than 100 Members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

12.     This Court has personal jurisdiction over FBCS because FBCS maintains its principal place of business in Pennsylvania and conducts substantial business in Pennsylvania and in this district through its principal place of business; engaged in the conduct at issue herein from and within this District; and otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because FBCS resides in this district, and this district is where a substantial part of the acts, omissions, and events giving rise to Plaintiff' claims occurred.

## PARTIES

14.     Plaintiff Mickey Hwang resides in Fort Lee, New Jersey. As noted above, Mr. Hwang received a letter from FBCS dated April 26, 2024 which confirmed that his personal information – including his name, Social Security number, birth date and unspecified "account information" – was involved in the Data Breach. Upon receiving this letter, Mr. Hwang spent considerable time changing his passwords and setting up credit alerts for new accounts and attempts to access existing accounts.

15.     Defendant Financial Business and Consumer Solutions, Inc. is a Delaware corporation with its principal place of business located at 330 S Warminster Road, Suite 353, Hatboro, PA 19040.

## FACTUAL ALLEGATIONS

### I.    The Data Breach

16.     On or around April 26, 2024, FBCS publicly announced that confidential PII maintained by FBCS was accessed by an unauthorized party.

17.     FBCS began notifying only certain affected persons of the Data Breach by U.S. mail on April 26, 2024.

18.     According to the Notice Letter, FBCS discovered on February 26, 2024, that an unauthorized party gained access to FBCS's systems on February 14, 2024. FBCS confirmed individual's PII was "accessed or exfiltrated" by the unauthorized party.

19.     FBCS's Notice Letter further provides that FBCS "immediately took steps to secure the impacted environment" and has "implemented additional safeguards in a newly built environment". *See* Notice Letter. FBCS has not disclosed specifically what additional safeguards have been taken to ensure that another security incident does not occur.

20.     In the Notice Letter, FBCS encourages individuals affected by the Data Breach to "remain vigilant against incidents of identify theft and fraud, to monitor [their] account statements to detect errors, and to review [their] credit reports for suspicious activity."

21.     According to a recent March 21, 2023 article in Bloomberg entitled "Banks, Financial Industry Hit by Rising Ransomware Attacks," the Financial Services Information Sharing and Analysis Center's ("FS-ISAC") annual outlook on cyber threats in the financial services industry found that "ransomware remained the biggest concern," as the "increase in attacks was likely due to the proliferation of the ransomware-as-a-service model, in which hacking groups provide 'affiliates' with the malware and services necessary to carry out an attack, in exchange for a share of the criminal proceeds." FS-ISAC cited "business email compromise" in which criminals send an email that appears to come from a known source making a legitimate request — as a major issue for the financial services sector, with members reporting a 300% increase from 2021 to 2022.

22.     According to UK security firm Sophos, "[c]yberattackers on average have 11 days after breaching a target network before they're being detected…and often when they are spotted it's because they've deployed ransomware." Sophos found that this was "more than enough time for an attacker to get a thorough overview of what a target network looks like, where its weaknesses lie, and for ransomware attackers to wreck it."

23.     To put in context, according to Sophos, "11 days potentially provide attackers with approximately 264 hours for malicious activity, such as lateral movement, reconnaissance, credential dumping, data exfiltration, and more. Considering that some of these activities can take just minutes or a few hours to implement, 11 days provide attackers with plenty of time to do damage."

## II.     Defendant Obtains, Collects, and Stores Plaintiff's and Class Members' PII

24.     FBCS refers to itself as a "debt collection agency," offering "specialized solutions to meet the diverse needs of creditors across a variety of different product verticals including consumer credit, healthcare, commercial, auto, education and utilities. Our systems seamlessly integrate with your business processes to make us an extension of your customer service capabilities." [7]

25.     Due to the nature of these services, FBCS requires that its customers entrust it with highly sensitive PII, which it stores electronically. In the ordinary course of receiving services from FBCS, clients of FCBS were required to provide Plaintiff's and Class Members' PII to Defendant. FCBS uses this information for, *inter alia*, to complete its collection of debts.

---

[7] https://www.fbcs-inc.com/contact-solutions/ (last visited May 1, 2024).

24.     FBCS maintains, keeps, and exploits Plaintiff's and Class Members' PII for FBCS's own benefit, including long after individuals have paid off their accounts in full. FBCS keeps and stores this legacy information on its systems in an unsecure manner.

25.     FBCS is in complete operation, control, and supervision of its servers and systems.

26.     FBCS intentionally configured and designed its servers and systems in such a way that allowed it to be susceptible to cyber-attack. Further, FBCS intentionally configured and designed its servers and systems without adequate data security protections and without regard to Plaintiff' and Class Members' PII, which was disclosed to cyber criminals.

27.     Companies using its services entrusted FBCS with their customers' PII. Further, these companies did not properly verify, oversee, and supervise FBCS's entrustment of their customers' PII.

28.     By obtaining, using, disclosing, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

29.     Plaintiff and Class Members reasonably expect that financial institutions and their vendors, such as Defendant, will use the utmost care to keep their PII confidential and securely maintained, to use this information for business purposes only, to only store it until it is no longer needed, to properly dispose of it, and to make only authorized disclosures of this information.

30.     Defendant failed to prioritize data and cyber security by adopting reasonable data and cyber security measures to prevent and detect the unauthorized access to Plaintiff's and Class Members' PII.

31.     Had Defendant remedied the security deficiencies, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the theft of Plaintiff's and Class Members' confidential PII.

32.     Given the rise in cyber-attacks in the financial services industry, FBCS was a prime target in this Data Breach. While FBCS claims that it discovered on February 26, 2024 that an unauthorized party gained access to FBCS's systems on February 14, 2024, given what is known about cyber-attacks, how long hackers typically lie hidden in a company's systems before being discovered, as well as the scope of the PII involved in this Data Breach, hackers were likely in FBCS's systems and servers well before February 14, with unfettered access to Plaintiff's and Class Members' PII.

### III.     Defendant's Data Security Failures

33.     By its own admission, FBCS "operate[s] on state of the art technology platforms that keep [it] compliant with information security requirements for large organizations and all state and federal regulations" and its "team is trained on security policies to keep [its] facilities your data safe."[8] However, FBCS's words ring hollow. As described *infra*, FBCS's emphasis on proper data security in its "information systems" was woefully lacking and anything far from "state of the art."

34.     As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection." However, FBCS took no such precautions to appropriately secure Plaintiff's and Class Members' PII.

35.     Further, FBCS's data retention practices were also woefully lacking. FBCS continued to store and maintain PII for many years after FBCS had appropriate use for such data.

---

[8] https://www.fbcs-inc.com/compliance/ (last visited May 1, 2024).

36.     FBCS failed to archive such PII and remove it from its servers and systems, which allowed hackers to gain access to the PII in the Data Breach.

37.     Up to, and including, the period when the Data Breach occurred, Defendant breached its duties, obligations, and promises to Plaintiff and Class Members by its failure to:

a.  hire qualified personnel and maintain a system of accountability over data security, thereby knowingly allowing data security deficiencies to persist;

b.  properly supervise and train its employees, and ensure that their vendor's employees were supervised and trained, about the risk of cyberattacks and how to mitigate them, including by failing to implement adequate security awareness training that would have instructed employees about the risks of common techniques, what to do if they suspect such attacks, and how to prevent them;

c.  address well-known warnings that its systems and servers, and those of its vendors, were susceptible to a data breach;

d.  implement certain protocols that would have prevented unauthorized programs, such as malware and ransomware, from being installed on its servers and systems that accessed customers' personal information and otherwise would have protected customers' sensitive personal information;

e.  install software to adequately track access to its network, monitor the network for unusual activity, and prevent exfiltration of data, which would have detected the presence of hackers and prevented customers' sensitive personal information from being stolen. Specifically, there are recommended, available measures to prevent data from leaving protected systems and being sent to untrusted networks outside of the corporate systems; and

  f. adequately safeguard customers' sensitive personal information and maintain an adequate data security environment to reduce the risk of a data breach or unauthorized disclosure.

38. Up to, and including, the period when the Data Breach occurred, Defendant breached their duties, obligations, and promises to Plaintiff and Class Members by its failure to oversee the entrustment of Plaintiff's and Class Members' PII.

## IV. Defendant's Failure to Comply with Government and Industry Guidelines, Standards, and Recommendations

39. According to FBCS, "[t]he security of our clients' data is our top priority at [FBCS]." FBCS says it accomplishes this by "operate on state of the art technology platforms that keep us compliant with information security requirements for large organizations" and by ensuring that its team "is trained on security policies to keep our facilities and your data safe."[9]

40. However, FBCS fell woefully short not only in its own self-professed "security standards," but also industry standards as well.

41. Hackers routinely target financial services providers and vendors, such as FBCS, since they are particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

42. Industry experts identify several best practices, that at a minimum, should be implemented by ARM companies such as FBCS, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and antimalware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

---

[9] https://www.fbcs-inc.com/compliance/ (last visited May 1, 2024).

43.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls ("CIS CSC"), which are all established standards in reasonable cybersecurity readiness.

44.     The above government and industry frameworks are existing and applicable industry standards in the financial services industry. FBCS failed to comply with these accepted standards.

45.     At all times, FBCS was in complete control of the configuration and design of its servers and systems.

## V.     Defendant's Data Security Failures Constitute Unfair and Deceptive Practices and Violations of Consumers' Privacy Rights

46.      Defendant are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The U.S. Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for sensitive personal information is an "unfair practice" in violation of the FTC Act.

47.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

48.     In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal information that they keep, properly dispose of personal information that is no longer needed;

encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone may be trying to hack the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

49.     The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

50.     The FTC further recommends companies not maintain PII longer than is needed for authorization of a transaction, limit access to private data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

51.     The FTC has also brought enforcement actions against businesses for failing to adequately and reasonably protect personal data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information as an unfair act or practice prohibited by Section 5 of the FTC Act. The FTC has issued orders against businesses that have failed to employ reasonable measures to secure sensitive personal information. These orders provide further guidance to businesses regarding their data security obligations.

52.     The FTC deems the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

53.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive driver's license numbers and Social Security numbers stolen, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

54.     FBCS was always fully aware of its obligations to protect PII since it was in the business as an ARM of obtaining, collecting, and disclosing PII as well as collecting, storing, and using other confidential personal and financial information. Defendant were also aware of the significant repercussions that would result from its failure to do so.

55.     Prior to the Data Breach and during the breach itself, Defendant failed to follow guidelines set forth by the FTC and actively mishandled the management of its IT security.

56.     Furthermore, by failing to have reasonable data security measures in place, Defendant engaged in an unfair act or practice within the meaning of Section 5 of the FTC Act.

## VI.     The Value of the Disclosed PII and Effects of Unauthorized Disclosure

57.     The fact that Defendant has a privacy policy shows that it understood the protected PII it transfers, acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.[10]

58.     PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that

---

[10] https://www.fbcs-inc.com/privacy-policy/ (last visited May 1, 2024).

consumers' sensitive personal information commonly stolen in data breaches "has economic value." The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cyber criminals routinely post stolen personal information on anonymous websites, making the information widely available to the criminal underworld.

59.     There is an active and robust market for this information. As John Sancenito, President of Information Network Associates, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

60.     Some of the forms of PII involved in this Data Breach are particularly concerning. Unique Social Security and driver's license numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies, in order to update the person's accounts with those entities.

61.     Experian, a globally recognized credit reporting agency, has explained "[n]ext to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves." This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the Department of Motor Vehicles, and other government agencies, financial institutions, places of employment, doctor's offices, and other entities.

62.     For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and

fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

63.     ***Social Security numbers***—which were also compromised as a result of the Data Breach—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive and cannot easily be replaced.

64.     Indeed, even the Social Security Administration ("SSA") warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

65.     Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security

numbers a prime target for cyber criminals and a particularly attractive form of PII to steal and then sell.

66.     The ramifications of Defendant's failure to keep Plaintiff' and Class Members' PII secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

67.     Thus, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its servers and systems were breached. However, FBCS failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

68.     As highly sophisticated parties that handle sensitive PII, Defendant failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff' and other Class Members' PII to protect against anticipated threats of intrusion of such information.

69.     Identity thieves use stolen PII for various types of criminal activities, such as when personal and financial information is used to commit fraud or other crimes, including credit card fraud, phone or utilities fraud, bank fraud, and government fraud.

70.     The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cyber criminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email,

text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

71.     There is often a lag time between when fraud occurs versus when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

72.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

73.     Plaintiff and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

74.     Thus, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

## VII.    The Data Breach Damaged Plaintiff and Class Members

75.     As a result of Defendant's deficient security measures, Plaintiff and Class Members have been harmed by the compromise of their sensitive personal information, which is likely currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

76.     Plaintiff and Class Members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their driver's license and Social Security numbers, email addresses, and addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

77. Many Class Members will also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

78. Plaintiff and Class Members also suffered a "loss of value" of their sensitive personal information when it was stolen by hackers in the Data Breach. A robust market exists for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information—at specific identifiable prices. This market serves as a means to determine the loss of value to Plaintiff and Class Members.

79. Plaintiff's and Class Members' stolen personal information is a valuable commodity to identity thieves. William P. Barr, former United States Attorney General, made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value." The purpose of stealing large caches of personal information is to use it to defraud consumers or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit payment card fraud. One commentator confirmed, explaining that, "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

80. Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiff and Class Members gathered from underground sources, public sources, or even Plaintiff's and Class Members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiff and Class Members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiff's and Class Members' names, taking out

loans in Plaintiff' and Class Members' names, using Plaintiff's and Class Members' information to obtain government benefits, filing fraudulent tax returns using Plaintiff' and Class Members' information, obtaining Social Security numbers in Plaintiff's and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

81.     Plaintiff and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach. These efforts are burdensome and time-consuming, especially because Defendant have failed to disclose how long the Data Breach lasted, forcing customers to continue to monitor their accounts indefinitely.

82.     Class Members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent Class Members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class Members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

83.     In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that

"among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

84.     A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose personal information (including driver's license and Social Security numbers) has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

85.     To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant have only offered two years of inadequate identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

86.     The two years of credit monitoring offered to persons whose PII was compromised is wholly inadequate, as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What is more, Defendant place the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

87.     The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data

is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

## VIII.   Defendant's Failure to Notify Plaintiff and Class Members in a Timely or Adequate Fashion Exacerbated the Damages

88.     As detailed above, FBCS claims to have first discovered the Data Breach on February 26, 2024, yet Defendant failed to begin notifying Plaintiff and Class Members until April 26, 2024.

89.     This period of approximately two months could have been used by Plaintiff and Class Members to take steps to mitigate the damage caused by the Data Breach.

90.     Instead, Defendant concealed the Data Breach for well over a month, allowing the unauthorized third-party to potentially exploit Plaintiff' and Class Members' PII without any mitigation steps being taken.

91.     Plaintiff and Class Members were deprived of the opportunity to take any steps to prevent damage by Defendant's concealment of the Data Breach and failure to provide timely and adequate notice of the Data Breach to Plaintiff and Class Members.

## CLASS ALLEGATIONS

92.     Plaintiff brings this class action on behalf of himself and all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. The proposed Class is defined as:

> All persons whose PII was compromised in the Data Breach detected by FBCS on or about February 26, 2024.

93.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

94.    <u>Numerosity</u>: The Members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, FBCS has stated that over 2.6 million individuals' information was exposed in the Data Breach.

95.    <u>Commonality and Predominance</u>: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a.    Whether FBCS had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

b.    Whether FBCS's actions and its lax data security practices used to protect Plaintiff's and Class Members' PII and PHI violated the FTC Act, and/or other state laws and/or FBCS's other duties discussed herein;

c.    Whether FBCS failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

d.    Whether Plaintiff and Class Members suffered injury as a proximate result of FBCS's negligent actions or failures to act;

e.    Whether FBCS failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

f.    Whether an implied contract existed between Class Members and FBCS providing that FBCS would implement and maintain reasonable security measures to protect and secure Class Members' PII from unauthorized access and disclosure;

g.  Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and Class Members;

h.  Whether FBCS's actions and inactions alleged herein constitute gross negligence;

i.  Whether FBCS breached its duties to protect Plaintiff's and Class Members' PII; and

j.  Whether Plaintiff and all other Members of the Class are entitled to damages and the measure of such damages and relief.

96.  FBCS engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

97.  <u>Typicality:</u> Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed Members of the Class, had their PII compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by FBCS, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

98.  <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representatives of the Class in that they have no interests adverse to, or conflict with, the Class they seek to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

99.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FBCS, so it would be impracticable for Class Members to individually seek redress from FBCS's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

100.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101.     FBCS owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control. FBCS's duty arose independently from any contract to protect Plaintiff's and Class Members' PII.

102.     FBCS's duty to use reasonable care arose from several sources, including but not limited to those described below.

103.     FBCS had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of FBCS's inadequate security measures. By receiving, maintaining, and handling Plaintiff's and Class

Members' PII that is routinely targeted by criminals for unauthorized access, FBCS was obligated to act with reasonable care to protect against these foreseeable threats.

104.    FBCS's duty also arose from FBCS's position as a business associate. FBCS holds itself out as a trusted business associate of its clients, and thereby assumed a duty to reasonably protect the PII it obtains from its clients. Indeed, FBCS, which receives, maintains, and handles the PII from its clients was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

105.    FBCS knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems. FBCS knew, or should have known, of the many data breaches that targeted financial institutions in recent years.

106.    Given the nature of FBCS's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, FBCS should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

107.    FBCS breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class Members' PII.

108.    It was reasonably foreseeable to FBCS that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would

result in the unauthorized release, disclosure, destruction and/or dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

109.    But for FBCS's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

110.    As a direct and proximate result of FBCS's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the imminent and certainly impending increased risks of medical identity theft they face and will continue to face; (vii) actual or attempted fraud; (viii) continued risk of exposure to hackers and thieves of their Personal Information which remains in FBCS's possession, custody, and control; and (iv) emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks.

### COUNT II
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

111.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

112.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

113.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

114.     Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

115.     Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

116.     Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

117.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein and above and are entitled to damages, including compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

118.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

## <u>COUNT III</u>
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

119.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by FBCS and was ultimately accessed or compromised in the Data Breach.

121.    Plaintiff and Class Members conferred a monetary benefit upon FBCS in the form of monies paid for services. FBCS's business model would not exist save for the need to ensure the security of Plaintiff's and Class Members' PII in order to provide print, marketing execution, and supply chain management services to clients.

122.    The relationship between FBCS and Plaintiff and Class Members is not attenuated, as Plaintiff and Class Members had a reasonable expectation that the security of their PII would be maintained when they provided their PII to FBCS's clients.

123.    FBCS accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Upon information and belief, this financial benefit was, in part, conferred, when FBCS was paid by clients to use Plaintiff's PII to provide print, marketing execution, and supply chain management services to FBCS's clients.  FBCS also benefitted from the receipt of Plaintiff's and Class Members' PII.

124.    FBCS also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon FBCS maintaining the privacy and confidentiality of that PII.

125.    But for FBCS's willingness to commit to properly and safely collect, maintain and security PII, the PII would not have been transferred to and entrusted to FBCS. Further, if FBCS had disclosed that its security measures were inadequate, FBCS would not have gained the trust of its clients.

126.    As a result of FBCS's wrongful conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

127.    FBCS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff and Class Members PII, while at the same time failing to securely maintain that information from unauthorized access and compromise.

128.    FBCS should not be permitted to retain the money belonging to Plaintiff and Class Members. It would be unjust, inequitable, and unconscionable to retain the benefits it received and is still receiving from Plaintiff and Class Members because FBCS failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

129.    The benefit conferred upon, received, and enjoyed by FBCS was not conferred officiously or gratuitously, and it would be inequitable and unjust for FBCS to retain the benefit.

130.    FBCS should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## <u>COUNT IV</u>
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

131.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

132.    Plaintiff and Class Members were required to provide Defendant with their PII in exchange for use of Defendant's services.

133.    By Plaintiff and Class Members providing their PII, and by Defendant accepting this PII, the parties mutually assented to implied contracts. These implied contracts included an implicit agreement and understanding that: (1) Defendant would adequately safeguard Plaintiff' and Class Members' PII from foreseeable threats; (2) Defendant would only disclose the PII to authorized individuals for business purposes; (3) Defendant would delete the PII of Plaintiff and Class Members once it no longer had a legitimate need; and (4) Defendant would provide Plaintiff and Class Members with notice within a reasonable amount of time after suffering a data breach.

134.    Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Defendant.

135.    Defendant provided consideration by providing it services, while Plaintiff and Class Members provided consideration by providing valuable property, their PII. Defendant benefitted from the receipt of this PII by increasing profit from additional business.

136.    Plaintiff and the Class Members fully performed their obligations under the implied contracts with Defendant.

137.    Plaintiff and Class Members would not have provided their PII to Defendant in the absence of Defendant's implied promise to keep their PII reasonably secure.

138.    Defendant breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures.

139.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class Members sustained damages, as alleged above. Plaintiff and Class Members are entitled to compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

140.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF
## PURSUANT TO THE DECLARATORY JUDGMENT ACT
### (On Behalf of Plaintiff and the Class)

141.    Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

142.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

143.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether FBCS is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that FBCS's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their PII and

remain at imminent risk that further compromises of their PII still in FBCS's possession, custody, and control will occur in the future.

144.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  A declaration that FBCS owes a legal duty to secure PII obtained from its clients and to timely notify Plaintiff and Class Members of such a data breach under the common law, Section 5 of the FTC Act;

b.  A declaration that FBCS breached and continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII and PHI; and

c.  A declaration that FBCS's practice of using insecure, outdated, and inadequate email and computer systems and software that are easy to hack for storage and communication of PII and PHI data between FBCS and third parties is unlawful.

145.    This Court should also issue corresponding prospective relief requiring FBCS to:

d.  cease the unlawful practices described herein, and enjoining FBCS from disclosing or using PII or PHI without first adequately securing or encrypting it;

e.  seek, obtain, encrypt, and retain at the conclusion of this action all existing PII and PHI in their possession or the possession of third parties and provide it to Plaintiff and the Class Members;

f.  engage a third-party ombudsman as well as internal compliance personnel to monitor, conduct, test, and audit FBCS's safeguards and procedures on a periodic basis;

g.  audit, test, and train its internal personnel regarding any new or modified safeguards and procedures;

h.  conduct regular checks and tests on its safeguards and procedures;

i.  periodically conduct internal training and education to inform internal personnel how to immediately identify violations when they occur and what to do in response;

j.  meaningfully educate its former and current employees about their privacy rights by, without limitation, written statements describing with reasonable specificity the precautionary steps FBCS is taking to update its security technology to adequately secure and safeguard employee PII; and

k.  identify to each Class Member in writing with reasonable specificity the PII and personal information of each such Class Member that was stolen in the Data Breach.

146.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at FBCS. The risk of another such breach is real, immediate, and substantial. If another breach at FBCS occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

147.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to FBCS if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to FBCS of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and FBCS has a pre-existing legal obligation to employ such measures.

148.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at FBCS, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose PII would be further compromised.

**COUNT VI**
**BREACH OF CONTRACTS TO WHICH PLAINTIFF AND CLASS**
**MEMBERS WERE INTENDED THIRD PARTY BENEFICIARIES**
**(On behalf of Plaintiff and the Class)**

149.     Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

150.     FBCS had contracts with each of the business entities on whose behalf it agreed to conduct debt collection services. Upon information and belief, a principal purpose of those contracts was to securely store, transmit and safeguard the PII of Plaintiff and class members.

151.     Upon information and belief, FBCS and each of the contracting entities expressed an intention that Plaintiff and class members were intended third party beneficiaries of these agreements.

152.     FBCS breached its agreements with these entities by allowing the Data Breach to occur, and as otherwise set forth herein.

153.     FBCS's breach caused foreseeable and material damages to Plaintiff and class members. This breach caused, *inter alia*, consequential and nominal damages to Plaintiff and class members.

**COUNT VII**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. §§56:8-1, et seq. ("CFA")**
**(On behalf of Plaintiff and the Class)**

154.     Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

155.    The New Jersey Consumer Fraud Act was created to protect New Jersey consumers from fraudulent business practices.

156.    FBCS has engaged in deceptive, unconscionable, unlawful, unfair, false, fraudulent and misleading practices by failing to take reasonable measures to safeguard the sensitive PII entrusted to it.

157.    Specifically, FBCS has engaged in unlawful conduct by failing to maintain adequate security protections which allowed the Data Breach to occur. FBCS misrepresented the character of the safety and security of PII, and its conduct violated the NJCFA by: (a) failing to maintain adequate computer systems and data security practices to safeguard PII; (b) failing to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft; (c) continuing to gather and store PII, and other personal information, after FBCS knew or should have known of the security vulnerabilities of its computer systems that were exploited in the Data Breach; (d) continuing to gather and store PII, and other personal information, after FBCS knew or should have known of the Data Breach and before FBCS allegedly remediated the Data Breach; and (e) delaying in notifying the Plaintiff and Class Members of the Data Breach and the full scope of the Data Breach.

158.    Plaintiff has been injured as a result of FBCS' conduct as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in her favor and against FBCS as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.      Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, nominal damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of themselves and the Class, seeks appropriate injunctive relief designed to prevent FBCS from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: May 13, 2024

Respectfully submitted,

*/s/ Samantha E. Holbrook*
Benjamin F. Johns (PA ID 201373)
Samantha E. Holbrook (PA ID 311829)
Andrea L. Bonner (PA ID 332945)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380
bjohns@shublawyers.com
sholbrook@shublawyers.com
abonner@shublawyers.com

*Counsel for Plaintiff Mickey Hwang
and the Putative Class*